IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| **TYZHIMA BUTLER**, individually, and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>**SPECIALIZED LOAN SERVICING LLC**,<br><br>Defendant. | Civil Action No. 1:24-cv-01087-PAB-SBP |

**PLAINTIFF'S PRE-DISCOVERY MOTION AND MEMORANDUM OF LAW FOR CONDITIONAL COLLECTIVE CERTIFICATION AND COURT-AUTHORIZED NOTICE TO POTENTIAL OPT-IN PLAINTIFFS PURSUANT TO 29 U.S.C. § 216(b)**

Plaintiff, Tyzhima Butler ("Plaintiff"), individually and on behalf of all others similarly situated, hereby moves under Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b), for Court-authorized Notice of this lawsuit to all similarly situated employees. Plaintiff respectfully requests that the Court enter an Order:

(1) Conditionally certifying the proposed FLSA Collective;

(2) Requiring Defendant to identify all putative collective members by providing a list of their names, last known addresses, dates and location of employment, phone numbers, and email addresses in electronic and importable format within ten (10) days of the entry of the order;

(3) Authorizing Plaintiff's proposed form of Notice (**Exhibits A** & **B**) and implementing a procedure whereby the Notice of Plaintiff's FLSA claims are sent (via U.S. Mail, email, and text message) to:

*All current and former hourly customer service agents who worked for Defendant at any time during the past three years* (the "FLSA Collective").

(4) Appointing the undersigned counsel as counsel for the FLSA Collective; and

(5) Giving members of the FLSA Collective sixty (60) days to join this case, measured from the date the Court-authorized Notice is sent, with one reminder email sent thirty (30) days thereafter to anyone who did not respond.

Pursuant to D.C.COLO.LCivR 7.1, Plaintiff's counsel sought concurrence from Defendant's counsel on November 8, 2024, but such concurrence was not obtained.

# I. INTRODUCTION

Plaintiff, Tyzhima Butler, and opt-in Plaintiff Alyssa Tweed, hereby bring this lawsuit individually and on behalf of all others similarly situated (hereinafter, "Plaintiffs") against Defendant Specialized Loan Servicing LLC ("Defendant") challenging its willful violations of the FLSA. Plaintiffs allege that Defendant willfully violated the FLSA by knowingly suffering or permitting Plaintiffs and all similarly situated to perform unpaid work before and during their scheduled shifts, failing to pay these employees the federally mandated overtime compensation, and failing to properly calculate Plaintiffs' and similarly situated employees' regular rates of pay.

Plaintiff Butler has already been joined by an opt-in Plaintiff, Alyssa Tweed, and believes more workers would participate if they were made aware of the lawsuit. Congress and the Supreme Court explicitly authorized employees to pursue FLSA claims on a collective basis through the opt-in procedure set forth in 29 U.S.C § 216(b). *See Hoffman-La Roche v. Sperling*, 493 U.S. 165, 170 (1989) ("A collective action allows . . . plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged ... activity").

In accordance with these public policies, pursuant to 29 U.S.C. § 216(b), Plaintiffs seek conditional certification of their FLSA claims on behalf of the following employee collective:

> *All current and former hourly call center agents who worked for Defendant at any time during the last three years* (the "FLSA Collective").

# II. FACTUAL BACKGROUND

## A. Parties and the Putative Collective

### *1. Defendant*

Defendant Specialized Loan Servicing LLC, also known as Computershare Loan Services

("CLS"), is "a leading international third-party mortgage service provider."[1] (Plaintiffs' Complaint, ECF No. 1, ¶ 25). To facilitate its business operations, Defendant employs hundreds of hourly, non-exempt call center agents under various job titles, such as Customer Service Representative, Default Support Representative, Client Success Representative, Document Verification Specialist, Recovery Collections Specialist, Transaction Processor, or similar positions (hereinafter collectively referred to as "Agents"), who work remotely from their homes providing customer, sales, and mortgage information support to Defendant's customers throughout the United States. (*Id*. at ¶ 28; **Ex. C**, Tyzhima Butler Declaration at ¶ 3; **Ex. D**, Alyssa Tweed Declaration at ¶ 3; **Ex. E**, Defendant's Job Descriptions[2]). Upon information and belief, Defendant has employed hundreds of Agents, including Plaintiffs, within the past three years across the United States to assist its customers with customer service needs. (*Id*. at ¶ 28).

### *2. Plaintiffs and the Putative FLSA Collective*

Plaintiff Tyzhima Butler worked for Defendant as a remote hourly Agent from September 2021 to November 2023, and was paid an hourly wage, most recently at $19.80. (ECF No. 1, ¶ 23**; Ex. C, ¶¶** 1, 4). Opt-in Plaintiff Alyssa Tweed worked for Defendant as a remote hourly Agent from February 2022 to June 2023 from her home in Denver, Colorado, and was paid an hourly wage, most recently at $22.25. (**Ex. D, ¶¶** 1, 4). As Agents working for Defendant, Plaintiffs had rigid schedules that required them to work at least eight (8) hours per day (with a thirty (30) minute unpaid meal period), on average five (5) days each week, and up to forty (40) hours or more in a

[1] *See* https://www.computershareloanservices.com/us/about-us/our-history (last visited on March 8, 2024).

[2] According to Defendant's website, Defendant was recently acquired by Newrez LLC, which also owns CLS and Shellpoint. Defendant's website and job postings each reference or redirect to these companies. (*See* https://www.shellpointmtg.com/sls/ (last visited November 8, 2024); https://www.newrez.com/about-us/ (last visited November 8, 2024)).

workweek. (ECF No. 1, ¶¶ 6, 34, 57, 63, 78-79; **Ex. C**, ¶¶ 5-6, 14, 17; **Ex. D**, ¶¶ 5-6, 14, 17). Agents were responsible for: (a) booting up their computers and logging into essential computer software programs *before* taking customer queries; (b) providing customer service to Defendant's customers**;** (c) ensuring that every live call is accounted for and responded to in a timely fashion; (d) conducting research utilizing available resources; and (e) documenting pertinent information. (ECF No. 1, ¶¶ 3, 4, 36, 38, 51-53; **Ex. C**, ¶¶ 6-7, 8-10; **Ex. D**, ¶¶ 6-7, 8-10; *see generally* **Ex. E**). Throughout their time as Agents, Plaintiffs were assigned to several different projects including customer, sales, and mortgage information support. (**Ex. C**, ¶¶ 3, 6; **Ex. D**, ¶¶ 3, 6). Defendant's unlawful pay policies and timekeeping practices, as well as the nature of Plaintiffs' job duties, were substantially the same irrespective of the project to which they were assigned. (ECF No. 1, ¶¶ 2-3, 35-39; *see generally* **Ex. C**; **Ex. D**; **Ex. E**). Likewise, the nature of the computer software programs Plaintiffs utilized, as well as the fact that off-the-clock work was performed while booting up their computers and loading and logging into the computer software programs, did not materially vary across projects. (ECF No. 1 at ¶¶ 3-4, 35-39; *see generally* **Ex. C**; **Ex. D**).

**B. Defendant Failed to Properly Calculate Agents' "Regular Rate" of Pay**

All Agents were subjected to Defendant's unlawful pay practice of failing to pay Agents the correct overtime rate. (ECF No. 1, ¶¶ 83-98; 143-149). Plaintiffs and other Agents were eligible for, and received, non-discretionary bonuses and other remuneration in addition to their base hourly rate. (*Id*. at ¶¶ 83-84, 144; **Ex. C**, ¶¶ 21-24; **Ex. D**, ¶¶ 21-24**; Exhibit F –** Plaintiff Butler's Earnings Statements). As a company-wide practice, Defendant failed to take Plaintiffs' and other Agents' bonuses and other remuneration into consideration when calculating their regular rate of pay as required under the FLSA to determine the correct overtime rate premium. (*Id*.). Plaintiffs contend Defendant's failure to include non-discretionary bonuses in the regular rate calculation

violates the FLSA, which provides that non-discretionary bonus compensation must be factored into an employee's regular rate, which is then multiplied by 1.5 times to obtain the overtime rate. *See* 29 C.F.R. 778.211(c) ("Attendance bonuses, individual or group production bonuses, bonuses for quality and accuracy of work … must be included in the regular rate of pay").

Defendant implemented written policies for its non-discretionary bonuses whereby it promised all of its hourly employees these payments over and above their base hourly rates. (**Ex. C**, ¶ 21; **Ex. D**, ¶ 21). Defendant offered Agents numerous non-discretionary bonus payments, including, but not limited to, attendance bonuses, quality assurance bonuses, and other incentive-based bonus payments; These non-discretionary bonus payments are specifically labeled in Plaintiffs' paystubs as "Bonus" and "Incentive BNS." (*Id.*; *see also*, **Ex. F**). These bonus programs were active during the statutory timeframe applicable to the Collective. (*See* **Exs. C**, **D)**.

Most, if not all, of Defendant's Agents received payments under these written policies. (**Ex. C**, ¶ 22; **Ex. D**, ¶ 22; **Ex. F**). However, Defendant failed to include these bonuses in calculating Plaintiffs' and Agents' regular rate and overtime pay rates. (ECF No. 1, ¶¶ 83-85; *see also* **Ex. C**, ¶ 23; **Ex. D**, ¶ 23; **Ex. F**). Defendant's regular rate violations are plainly apparent on review of the Plaintiffs' paystubs. (*See e.g.*, **Ex. F**, Butler's Earnings Statements) (showing that incentive bonuses were not calculated into Plaintiff Butler's overtime rate).

### C. <u>All of Defendant's Agents Were Subjected to Similar Unlawful Policies and Practices and Were Trained to Work Off-the-Clock</u>

Like countless other customer service employers, Defendant maintained a common policy and practice of depriving its Agents of pay for all hours worked. (ECF No. 1, ¶¶ 1-2, 11, 29-82; *see generally* **Ex. C**; **Ex. D**). Defendant's policy and practice was achieved through, among other means, the training Defendant provided to its Agents and the timekeeping application Defendant required Agents to use. (ECF No. 1, ¶¶ 4-6, 29-45). Defendant provided *all* Agents with training

on how to carry out their day-to-day job duties, including how to load and log into their computer programs at the beginning of the day. (**Ex. C**, ¶ 6; **Ex. D**, ¶ 6). Defendant also taught Agents how to open and use Defendant's computer networks and software programs, the importance of attendance and schedule expectations, and Defendant's policies related to each topic. *Id.*

Once training was completed, Defendant required its Agents to follow daily computer login procedures. (ECF No. 1, ¶¶ 51-54; **Ex. C**, ¶¶ 8-10; **Ex. D**, ¶¶ 8-10). Agents, including Plaintiffs, were trained or instructed not to clock in until they had loaded all of their essential work-related computer programs so they could be prepared to take calls/field customer queries the moment their shift began. (ECF No. 1, ¶¶ 54-55; **Ex. C**, ¶¶ 8-16; **Ex. D**, ¶¶ 8-16). In other words, Defendant prohibited its Agents from clocking in until they were "phone ready." *Id*. These policies and procedures likewise applied when Agents returned from their lunch breaks. (ECF No. 1, ¶ 64; **Ex. C**, ¶¶ 17-19; **Ex. D**, ¶¶ 17-19). Because Defendant required its Agents to perform pre- and mid-shift off-the-clock work, the hours tracked in Defendant's timekeeping system were inaccurate representations of the total amount of time Agents spent working. (ECF No. 1, ¶ 44). Thus, the hours reflected on the Agents' paystubs were also inaccurate representations of the hours worked.

The DOL recognizes that call center jobs, like those held by Defendant's Agents, are homogenous, and it issued Fact Sheet #64 in July 2008 to alert call center employees to some of the abuses prevalent in the industry.[3] One of those abuses, which is at issue in this case, is the employer's refusal to pay for work "from the beginning of the first principal activity of the workday to the end of the last principal activity of the workday." *Id*. Specifically, Fact Sheet #64 condemns an employer's non-payment of an employee's necessary pre-shift activities: "An example of the first principal activity of the day for agents/specialists /representatives working in

---

[3] *See* DOL Fact Sheet #64: Call Centers under the Fair Labor Standards Act (FLSA), *https://www.dol.gov/agencies/whd/fact-sheets/64-flsa-call-centers* (last visited November 7, 2024).

call centers includes starting the computer to download work instructions, computer applications and work-related emails." *Id.* The FLSA also requires "[a] daily or weekly record of all hours worked, including time spent in pre-shift and post-shift job-related activities [] be kept." *Id.*

### D. <u>Defendant Maintained an Unlawful Policy and Practice of Failing to Pay its Agents for Necessary Pre- and Mid-Shift Work</u>

#### *1. Pre-Shift Off-the-Clock Work*

Agents were required to start up/log into/open various computer and software programs, servers, and applications in order to perform their jobs and assist Defendant's customers. (ECF No. 1, ¶ 4, 51-53; **Ex. C**, ¶ 7; **Ex. D**, ¶ 7). The pre-shift startup and login process took substantial time on a daily basis, ranging from five (5) to twenty (20) minutes per shift. (ECF No. 1, ¶ 55; **Ex. C**, ¶ 10; **Ex. D**, ¶ 10). Further, this mandatory process was performed *before* the Agents' scheduled shifts, as Defendant expressly instructed and trained Agents to have all of their computer networks, and software programs open and ready at the start of their shifts to ensure they were "phone ready" the moment their shifts began. (ECF No. 1, ¶ 54-56; **Ex. C**, ¶¶ 11-13; **Ex. D**, ¶¶ 11-13).

The time Agents spent booting up and logging into the programs and systems before and during their shifts was compensable because they were an integral and indispensable part of the Agent's work, and they could not perform their jobs effectively without them. (ECF No. 1, ¶ 38; **Ex. C**, ¶¶ 6-7, 8-9; **Ex. D**, ¶¶ 6-7, 8-9; *see also Garcia v. Vertical Screen, Inc.*, No. CV 18-4718, 2022 WL 125906, at *4 (E.D. Pa. Jan. 13, 2022) (time employees spend booting up computers and necessary software is compensable under the FLSA); *Peterson v. Nelnet Diversified Sols., LLC*, 15 F.4th 1033, 1041-42 (10th Cir. 2021) (all steps to boot up computer, work-related programs, and timekeeping software was integral and indispensable to work and therefore compensable); *Wilson v. Peckham*, No. 1:20-cv-565, 2021 WL 3168616, at *5 (W.D. Mich. July 26, 2021) ("the boot up and login process ... is akin to preparing a tool that the employee must use throughout the workday, like sharpening a knife"); *Jackson v. ThinkDirect Mktg. Grp., Inc.*, No. 16-cv-03449,

2019 WL 8277236, at *4 (N.D. Ga.) (the "requirement of logging in and out of electronics systems needed to process calls is at least integral to the work of answering phone calls")).

### 2. ***Mid-Shift Off-the-Clock***

Under federal law, in order to deduct an unpaid meal period from an employee's compensable time, an employee must be completely relieved of his or her employment duties for the entire meal period. 29 C.F.R. § 785.19(a) states:

> ***Bona fide meal periods.*** Bona fide meal periods are not work time. Bona fide meal periods do not include coffee breaks or time for snacks. These are rest periods. The employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period. A shorter period may be long enough under special conditions. The employee is not relieved if he is required to perform any duties, whether active or inactive, while eating. For example, an office employee who is required to eat at his desk or a factory worker who is required to be at his machine is working while eating.

Instead of complying with the law, Defendant failed to provide Agents with bona fide meal periods because it required the Agents to resume taking live calls and queries promptly at the end of their scheduled meal breaks, meaning that the Agents had to return to their computer stations prior to the end of their unpaid meal breaks to log back in and reconnect to computer programs. (ECF No. 1, ¶¶ 64; **Ex. C**, ¶¶ 18-19; **Ex. D**, ¶¶ 18-19). The work performed by Defendant's Agents during their unpaid meal breaks took substantial time on a daily basis, around three (3) to five (5) minutes per shift. *Id*. Moreover, while this work was integral and indispensable to an Agent's job duties and Defendant directly benefitted from such work, Agents were not paid for this time. *Id*.

## E. Defendant's FLSA Violations Are Widespread and Affected All Agents

All Agents, were subject to the same unlawful pay practices outlined herein. Agents did not receive compensation for the essential pre- and mid-shift work duties, were not compensated for all hours worked, were denied overtime wages at the rate of time-and-a-half for this time worked when it was in excess of forty (40) hours per week, and were not paid the correct overtime rate based on the FLSA's regular rate calculations. Defendant's off-the-clock work requirements,

overtime compensation deficiencies, and regular rate violations were pay practices applicable to every Agent, and accordingly, all Agents are similarly situated victims of Defendant's pay policies.

## III. LAW AND ARGUMENT

### A. The FLSA Authorizes Notice to Similarly Situated Employees.

The Supreme Court has held that courts have discretion to implement the collective action procedure by facilitating notice to potential class members.[4] The Court noted:

> A collective action allows … plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged … activity. These benefits, however, depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate.

*Id.* at 170. Conversely, failure to provide prompt notice frustrates the FLSA's broad remedial purposes and its specific grant of collective action rights to employees. *See Fisher v. Michigan Bell Telephone Co.*, 665 F. Supp. 2d 819, 828-29 (E.D. Mich. 2009).

### B. Courts in the Tenth Circuit Consistently Approve of and Apply a Lenient Standard When Conditionally Certifying an FLSA Collective Action.

The Tenth Circuit has adopted a lenient two-step procedure for assessing a collective action. "At the first step, prior to discovery, the district court makes a 'notice stage' determination whether plaintiffs are similarly situated." *Smith v. Pizza Hut, Inc.*, 2012 WL 1414325, at *3 (D. Colo. Apr. 21, 2012); *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102-1105 (10th Cir. 2001). As this motion has been filed pre-discovery, this matter is currently at the "notice stage."

#### 1. *Plaintiffs Bear a Light Burden of Proof*

Plaintiffs' burden of proof at the notice stage is low. At this stage, "courts use a fairly

---

[4] Although *Hoffman-LaRoche* is an Age Discrimination in Employment Act (ADEA) case, its analysis is applicable to FLSA cases because the ADEA incorporates the FLSA collective action provisions. *Mooney v. Aramco Servs. Co*, 54 F.3d 1207, 1212 (5th Cir. 1995); *Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 261 n.15 (S.D.N.Y. 1997) ("[I]n *Hoffman-LaRoche*, the Supreme Court construed § 216(b) on its own terms, and its analysis applies with equal force to FLSA cases.").

lenient standard to determine whether plaintiffs are similarly situated for purposes of sending notice to putative class members." *Gassel v. Am. Pizza Partners, L.P.*, 2015 WL 5244917, at *2 (D. Colo. Sept. 8, 2015). Specifically, "the Tenth circuit 'require[s] nothing more than substantial allegations that the putative class members were together victims of a single decision, policy, or plan" to grant conditional certification. *Smith,* 2012 WL 1414325, at *3; *see also Renfro v. Spartan Computer Services, Inc*., 243 F.R.D. 431, 434 (D. Kan. 2007)("Generally, where putative class members are employed in similar positions, the allegation that defendants engaged in a pattern or practice of not paying overtime is sufficient to allege that plaintiffs were together the victims of a single decision, policy or plan."). Because the Plaintiffs' burden is low, it is unusual for a motion for conditional certification to be denied in this District. *See Cannon v. Time Warner NY Cable LLC*, 2014 WL 4401313, at *3 (D. Colo. Sept. 5, 2014) (finding "only one example of a motion for conditional certification under FLSA being denied in the District of Colorado").

### 2. ***Evidence Typically Accepted to Meet the "Substantial Allegations" Test***

To determine whether to grant conditional certification, courts may rely on "the allegations of the complaint and any affidavits filed by plaintiffs." *Young v. Dollar Tree Stores, Inc.*, 2012 WL 3705005, at *1 (D. Colo. Aug. 24, 2012); *Vara v. TSM Properties, LLC*, 2014 WL 4555277, at *1 (D. Colo. Sept. 15, 2014). Courts have found one or two employee affidavits, coupled with the allegations in a complaint, sufficient to satisfy the "substantial allegations" requirement. *See Pliego v. Los Arcos Mexican Restaurants, Inc.*, 2015 WL 4600726, at *2 (D. Colo. July 31, 2015); *Lysyj v. Milner Distrib. All., Inc.*, 2014 WL 273214, at *3 (D. Colo. Jan. 24, 2014); *Daugherty v. Encana Oil & Gas (USA), Inc.*, 838 F. Supp. 2d 1127, 1133 (D. Colo. 2011).

### 3. ***At the Notice Stage, Courts Do Not Evaluate the Merits of Plaintiffs' Claims***

In making the determination of whether a group of similarly situated individuals exists, the Court should not evaluate the merits of the Plaintiffs' claims. *See Cannon*, 2014 WL 4401313, at

*5 ("merits disputes ... are best addressed on a motion to decertify"). Similarly, allegations that the parties' claims or defenses are too individualized are better raised in the second step of the two-step process. *Underwood v. NMC Mortg. Corp.*, 245 F.R.D. 720, 723 (D. Kan. 2007).

### C. Plaintiffs Substantial Allegations and Accompanying Evidence Satisfy the Low Standard for Conditional Certification

The core allegations in Plaintiffs' Complaint, coupled with the supporting declarations and Earnings Statement documentation, provide overwhelmingly sufficient evidence that Plaintiffs and all putative class members were together victims of a single decision, policy, or plan. *Smith*, 2012 WL 1414325, at *3. Plaintiffs' allegations, supported by **Exhibits C – F**, demonstrate:

(1) Plaintiffs and all others similarly situated were employed as Agents by Defendant and paid an hourly rate;

(2) Plaintiffs and all others similarly situated engaged in unpaid pre-shift work in the amount of five (5) to twenty (20) minutes per shift;

(3) Plaintiffs and all others similarly situated engaged in unpaid mid-shift work in the amount of three (3) to five (5) minutes per shift;

(4) Plaintiffs and all others similarly situated were eligible for, and regularly received, routine and non-discretionary bonuses;

(5) Defendant failed to incorporate these bonuses payments into Plaintiffs', and all others similarly situated, regular rates that it used to calculate overtime rates;

(6) Plaintiffs and all others similarly situated regularly worked in excess of 40 hours a week and were paid overtime for some of those hours, but at a rate that did not include Defendant's non-discretionary bonuses.

(ECF No. 1, ¶¶ 2-5, 48-55, 63-64, 83-98; *see also* **Ex. C**, ¶¶ 1-4, 8-12, 17-18, 20-24; **Ex. D**, ¶¶ 1-4, 8-12, 17-18, 20-24; **Ex. E**, **Ex. F**).

Plaintiffs' lack of overtime pay stems from common and pervasive policies, namely, Defendant's schedule and adherence policies and uniform practice of requiring Agents to boot-up their computers and log into essential computer software programs before and during their scheduled shifts, while off the clock. (**Ex. C**, ¶¶ 8-16, 17-19; **Ex. D**, ¶¶ 8-16, 17-19). The

declarations also demonstrate that the Agents' unpaid time is substantial, is required to perform their jobs, and is not *de minimis.*[5] (*Id.*). Agents consistently worked a *minimum* of eight (8) minutes of unpaid time per shift. (**Ex. C**, ¶¶ 10, 18; **Ex. D**, ¶¶ 10, 18, 25-26).

A number of single or dual-site location call center cases have been conditionally certified.[6] Furthermore, multi-site, multi-state, and nationwide call center workers have been conditionally certified.[7] On the whole, these cases share a similar set of facts, including: (1) policies or practices requiring workers to be "caller-ready" at their scheduled start times, *see, e.g.*, *Bishop*, 256 F.R.D. at 508; *Fisher*, 665 F. Supp. 2d at 827, (2) negative consequences for workers that fail to adhere to their scheduled start times or minimum on-call metrics, *see, e.g., Fisher*, 665 F. Supp. 2d at 823; *Ribot*, 2013 WL 3778784, at *8; and (3) unpaid pre-shift work involving boot-up of computer programs, reading of email, and other work-related tasks, *see, e.g.*, *Sherrill*, 487 F. Supp. 2d at 347, 350; *Garrett*, 2011 WL 5827240, at *1. The factual allegations asserted herein are substantially the same as each of the conditionally certified call center cases cited above.

Plaintiffs' substantial allegations and declarations are buttressed by evidence of substantially similar job postings on Defendant's websites. (**Ex. E**). These job postings, spanning

---

[5] This is to the extent that the *de minimis* doctrine remains a valid legal defense after the Supreme Court decision in *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220 (2014). Further, in *Peterson v. Nelnet Diversified Sols., LLC*, a 2021 call center matter with facts nearly identical to those here, the Tenth Circuit granted partial summary judgment in favor of the plaintiffs on the issues of compensability and the inapplicability of the *de minimis* doctrine. *Peterson*, 15 F.4th 1033, 1049 (10th Cir. 2021). The Court in *Peterson* held that the amount of time devoted to booting up and logging on – 2.27 minutes in that case – "is not so miniscule that it would be difficult to measure." *Id.* at1043-1044.

[6] *See Byard v. Verizon W. Virginia, Inc.*, 287 F.R.D. 365, 367 (N.D.W. Va. 2012); *Clarke v. Convergys Customer Mgmt. Grp., Inc.*, 370 F. Supp. 2d 601, 603 (S.D. Tex. 2005).

[7] *See Beattie v. TTEC Healthcare Solutions, Inc.*, 2019 WL 2866559, at *3 (D. Colo. July 3, 2019); *Atkinson v. TeleTech Holdings, Inc.*, 2015 WL 853234, at *5 (S.D. Ohio Feb. 26, 2015); *Bishop v. AT & T Corp.*, 256 F.R.D. 503, 504 (W.D. Pa. 2009); *Fisher v. Mich. Bell Tel. Co.*, 665 F. Supp. 2d 819, 821 (E.D. Mich. 2009); *Ribot v. Farmers Ins. Grp.*, 2013 WL 3778784, at *1 (C.D. Cal. July 17, 2013).

multiple call center facilities (brick-and-mortar and virtual) across different states, reflect virtually identical job duties. Further, the company job postings demonstrate that, irrespective of the job title, campaign, or call center location (remote or in-person), Defendant treats its Agents the same company-wide and require them to possess the identical credentials and perform similar job duties. (*See* **Ex. E**). Courts have recognized that job descriptions containing similar job duties can establish a company-wide FLSA violation.[8] (*see also* **Ex. C**, ¶¶ 6-16, 17-19, 20-23, 25-27; **Ex. D**, ¶¶ 6-16, 17-19, 20-23, 25-27) (Defendant's pay policies and timekeeping practices, as well as the nature of the Agents' job duties, did not differ across job titles or call campaigns).

The pertinent facts are that in each Agent position, Defendant's employees are: (1) paid on an hourly basis; (2) classified as non-exempt employees; (3) use a web-based timekeeping system(s); (4) use many (if not all) of the same computer programs; (5) are subject to the same relevant timekeeping and attendance policies (including Defendant's unlawful time rounding policy); and (6) have the primary job duty of providing assistance to Defendant's clients' customers. (ECF No. 1 at ¶¶ 3-7, 29-47, 48-61, 63-64, 83-98). For all these reasons, this Court should grant Plaintiffs' request to conditionally certify the FLSA Collective and authorize Plaintiffs' counsel to circulate the Notice attached as **Exhibit A**.

### D. <u>Plaintiffs Are Entitled to a List of All Collective Members</u>

To facilitate timely notice to the FLSA Collective, Plaintiffs request that the Court order Defendant, within ten (10) days of the entry of the Order conditionally certifying this action, to identify each FLSA Collective member by full name, last known address, telephone number, email address, and dates and location of employment. Courts in the Tenth Circuit have granted plaintiffs'

---

[8] *See Saddler v. Memphis City Schools*, 2013 WL 12100720, at *5 (W.D. Tenn. Feb. 4, 2013); *Wade v. Werner Trucking Co.*, 2012 WL 5378311, at *4 (S.D. Ohio Oct. 31, 2012); *Meyer v. Panera Bread Co.*, 344 F. Supp. 3d 193, 204 (D.D.C. 2018).

requests for the contact information of putative collective action members. *See, e.g., Beattie,* 2019 WL 2866559, at *2; *Pogue v. Chisholm Energy Operating, LLC*, 2021 WL 5861184, at *9 (D.N.M. Dec. 10, 2021) (same); *Green v. Drake Beam Morin, Inc.*, 2011 WL 6046940, at *3 (D. Colo. Dec. 6, 2011) (same). Discovery of this information is permitted to facilitate effective notice to potential class members so they may exercise their right to opt in. *Hoffmann-La Roche*, 493 U.S. at 170; *see also Ortez v. United Parcel Serv., Inc.*, 2018 WL 3913131, at *4 (D. Colo. Aug. 16, 2018) ("This district has recognized that obtaining a person's last known physical address or email address is necessary for providing FLSA notice through reasonable means of mail or email.") (citing cases).

### E. Plaintiffs' Proposed Notice Should be Approved

"'Absent reasonable objections by either the defendant or the court, plaintiffs should be allowed to use the language of their choice in drafting the notice.'" *Frykenberg v. Captain George's of S.C., LP*, 2020 WL 5757678, at *4 (D.S.C. Sept. 28, 2020) (quoting *Hose v. Henry Indus., Inc.*, 49 F. Supp. 3d 906, 919 (D. Kan 2014), *order clarified by* 2014 WL 5510927 (D. Kan. Oct. 31, 2014)). Plaintiffs' proposed Notice is in the form regularly approved in FLSA collective actions in courts across the country, and should be approved without alterations.[9]

### F. Notice Should be Sent by Mail, E-Mail, and Text Message

This Court and other courts in the Tenth Circuit have found it appropriate to distribute notice by way of e-mail in addition to first-class mail. *See e.g., Pogue*, 2021 WL 5861184, at *9; *Rapp v. HV Occupational Health Advisors of Am., LLC*, 2021 WL 4426956, at *6 (D. Colo. Sept. 27, 2021); *German*, 2021 WL 1087718, at *5; *Beattie*, 2019 WL 2866559, at *2; *Foster*, 2016 WL 4492829, at *6; *Pruess v. Presbyterian Health Plan, Inc.*, 2020 WL 6544243, at *8 (D.N.M. Nov.

---

[9] *See Beattie*, 2019 WL 2866559, at *2 ; *Gaffers v. Kelly Servs.*, No. 16-cv-10128 (E.D. Mich. 2016); *Williams v. Sykes, et al.*, No. 13-cv-946 (D. Minn. 2013); *Stelmachers v. Maxim Healthcare Services, Inc.*, No. 13-cv-01062 (N.D. Ga. 2013).

6, 2020). In addition, the Court should permit distribution of notice via text message. *See Pogue*¸ 2021 WL 5861184, at *9 (finding "mail, email, and text message" as appropriate methods for notice distribution"); *Beattie*, 2019 WL 2866559, at *2. Text message notice is especially appropriate in light of the turnover rate in the call center industry,[10] and has been approved by numerous courts, especially when, as here, such a turnover rate exists. *See Beattie*, 2019 WL 2866559, at *2; *Bhumithanarn v. 22 Noodle Market Corp.*, 2015 WL 4240985, at *5 (S.D.N.Y. July 13, 2015) (text message "viable and efficient means of communicating with many prospective members of this collective action"). Finally, the Court should approve a 60-day opt-in period and allow the issuance of one reminder email 30 days into the notice period.[11]

## IV. CONCLUSION

For the reasons explained above, Plaintiffs respectfully request that the Court, pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b), enter an Order granting the relief requested herein.

Dated: November 14, 2024

Respectfully Submitted,

<u>*s/ Kevin J. Stoops*</u>
Kevin J. Stoops
Albert J. Asciutto
SOMMERS SCHWARTZ, P.C.
One Towne Square, 17th Floor
Southfield, Michigan 48076
Phone: (248) 355-0300
Email: kstoops@sommerspc.com
Email: aasciutto@sommerspc.com

*Attorneys for Plaintiff, the FLSA Collective, and the Putative Class*

---

[10] Turnover rates for the call center industry range between 30-45%. (*http://qatc.org/winter-2015-connection/exploring-call-center-turnover-numbers/* (last visited Feb. 18, 2022).

[11] *See Robertson v. REP Processing, LLC*, 2021 WL 4255027, at *4 (D. Colo. Sept. 16, 2021) (finding a reminder warranted because plaintiff argued that the pandemic has created barriers to communication with collective members); *Pogue*, 2021 WL 5861184, at *9; *German*, 2021 WL 1087718, at *4; *Ortez v. United Parcel Serv., Inc.*, 2018 WL 4328170, at *3 (D. Colo. Sept. 11, 2018); *Beltran v. InterExchange, Inc.*, 2017 WL 4418684, at *7 (D. Colo. Apr. 28, 2017)

**CERTIFICATE OF SERVICE**

I hereby certify that on November 14, 2024, I electronically filed the foregoing document using the Court's electronic filing system, which will notify all counsel of record authorized to receive such filings.

*/s/ Kevin J. Stoops*

Kevin J. Stoops (P64371)
Albert J. Asciutto (P82822)
SOMMERS SCHWARTZ, P.C.
One Towne Square, 17th Floor
Southfield, Michigan 48076
Phone: (248) 355-0300
Email: kstoops@sommerspc.com
Email: aasciutto@sommerspc.com