IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**TYZHIMA BUTLER**, individually, and on behalf of all others similarly situated,

Plaintiffs,

v.

**SPECIALIZED LOAN SERVICING LLC**,

Defendant.

Civil Action No. 1:24-cv-01087-PAB-SBP

**DECLARATION OF ALYSSA TWEED**

I, Alyssa Tweed, an adult resident of the state of Colorado, hereby state under penalty of perjury that the following facts are true and correct to the best of my knowledge, information, and belief:

1. I am a Denver, Colorado, resident and from approximately February 2022 through June 2023 I worked remotely for Specialized Loan Serving LLC ("SLS") as an hourly FHA Foreclosure – Default Support Representative from my home.

2. Defendant SLS, also known as Computershare Loan Services ("CLS"), is "a leading international third-party mortgage service provider."[1]

3. Through my training and experience, I understand Defendant employs hundreds of hourly, non-exempt call center agents under various job titles to facilitate its business operations, such as Customer Service Representative, Default Support Representative, Client Success Representative, Document Verification Specialist, Recovery Collections Specialist, Transaction Processor, or similar positions (hereinafter collectively referred to as "Agents"), who work

[1] *See* https://www.computershareloanservices.com/us/about-us/our-history (Last visited on March 8, 2024).

remotely from their homes providing customer, sales, and mortgage information support to Defendant's customers throughout the United States.

4. As an hourly Agent, I was compensated with an hourly wage, most recently at the rate of approximately $22.25 per hour. In addition to the base rate of pay, I was also eligible for and regularly received various routine and non-discretionary bonuses. For example, Defendant offered hourly employees numerous non-discretionary bonus payments, including, but not limited to quality assurance bonuses or other incentive-based bonus payments.

5. I typically worked (five) 5 days per week and regularly more than forty (40) hours in a week.

**Job Duties and Responsibilities**

6. SLS controlled my work schedule, duties, protocols, applications, assignments and employment conditions. SLS was also responsible for my training and continuing education in my role as an Agent. For example, SLS provided all Agents, including myself, with training on how to carry out our day-to-day job duties, how to load and log into their computer programs at the beginning of the day, how to log out at the end of the day, how to track our time, the importance of attendance and schedule expectations, and SLS's policies related to each topic. I received training remotely during my onboarding with SLS, which was conducted alongside other new employees.

7. As an Agent for SLS, my job duties included, but were not limited to, (a) booting up my computer and logging into essential computer software programs and applications; (b) conducting research utilizing available resources; and (c) documenting pertinent information. These job duties, as well as others for which I was responsible, were substantially the same

irrespective of the project to which the Agents, including myself, were assigned (for example, customer, sales, or mortgage information support, etc.).

**Unpaid Pre-Shift Work**

8. SLS's Agents, including myself, were trained and required to follow a specific protocol to start up and log into the company's computer network and numerous software programs in order to access the necessary information to perform our work.

9. The pre-shift boot-up and login process generally consisted of the following steps:

a. Turning on or waking up the computer;

b. Logging into the Citrix application;

c. Logging into the Microsoft Teams application;

d. Logging into the UAD application;

e. Logging into the Sagent application;

f. Logging into the One Note application;

g. Logging into the Notepad application; and

h. Opening Outlook, checking and responding to company emails, and ensuring all of the systems were operational.

10. The boot-up and login process described above took substantial time on a daily basis, ranging from five (5) to ten (10) minutes per shift, or more, depending on how fast/slow the computers and programs were operating.

11. I was required to complete each of these tasks prior to "punching in" as Agents could not be "ready" for work until these tasks were complete.

12. In order to comply with SLS's schedule adherence requirements, I typically did not "clock in" for my shifts until the start of my scheduled shifts, which resulted in me working off-

the-clock for at least five (5) to ten (10) minutes (or more) before each shift for which I was never compensated.

13. If I arrived at my computer immediately prior to my scheduled shifts, I would have to clock in late because I could not complete the required pre-shift work necessary to be "ready" for work when my scheduled shift began, and I would therefore receive a tardy on my record and poor adherence scores.

14. Because I often worked scheduled shifts of at least forty (40) hours per week, the above described and required pre-shift work was most often overtime work.

15. Defendant had knowledge that its Agents, including myself, began the pre-shift boot-up and login process off-the-clock in order to make sure we were "ready" for work and clocked in on time because it was required through their adherence metrics.

16. Agents were not compensated for any of this time because Defendant prohibits agents from clocking into its timekeeping software before the start of their scheduled shift and prohibits the agents from working unauthorized overtime.

**Mid-Shift Work During Unpaid Meal Periods**

17. As a SLS Agent, I was given a thirty (30) minute unpaid meal period for each work shift.

18. However, SLS also required its Agents to perform off-the-clock work during these unpaid meal periods, including returning from the meal period approximately three (3) to five (5) minutes early in order to have enough time to log back in to Defendant's programs and software prior to resuming their shifts after the unpaid meal period. This process was similar to the pre-shift login process described above (albeit abbreviated), and this time went unpaid.

19. SLS knew that its Agents, including myself, took unpaid meal periods and that we also performed mid-shift off-the-clock work in order to complete all necessary documentation, field queries, and make sure we were "ready" for work and clocked in on time at the end of our break.

**Regular Rate Issues**

20. In September 2021, I was hired by SLS as a remote Agent. I was paid a base hourly rate of $22.25 per hour. During my time at SLS, I regularly worked over 40 hours per week.

21. In addition to the base rate of pay, SLS incorporated, and promised by way of written policies, various routine and non-discretionary bonuses into its payment structure for Agents. For example, SLS offered me and other Agents numerous non-discretionary bonus payments, including, but not limited to quality assurance bonuses and other incentive-based bonus payments. These non-discretionary bonus payments are evidenced in my paystubs.

22. I and all similarly situated Agents were eligible for, and regularly received, these various routine and non-discretionary bonuses in addition to our base hourly rate.

23. However, SLS failed to incorporate these bonus payments into the regular rate that it used to calculate my, and other Agent's, overtime rate.

24. I regularly worked in excess of 40 hours a week and was paid overtime for some of those hours, but at a rate that did not include SLS's non-discretionary based bonus payments.

**Other Agents Were Subject to Similar Work Conditions**

25. Throughout my employment with SLS, I met and came to know many other SLS Agents.

26. I have had multiple conversations with other Agents about SLS's compensation policies, including those described above, and its failure to pay Agents for all work performed.

From those conversations, I know that all of SLS's Agents were subject to similar pay practices and policies.

27. I have reviewed the remote customer service Agent positions for several different states posted to Defendant's employment websites and attached to Plaintiffs' Motion for Conditional Collective Certification as Exhibit E and they are substantially similar to the job description I reviewed before applying to work for Defendant.

As stated above, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: 11/08/2024

Alyssa Tweed